UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION


UNITED STATES OF AMERICA,            )
                                     )
      PLAINTIFF,                     ) CASE NO. 2:24-cr-190
                                     )
            vs.                      )
                                     )
ANDRES TUCCILLO,                     )
                                     )
      DEFENDANT.                     )
_____     )


            TRANSCRIPT OF CONTINUED SENTENCING PROCEEDINGS
        BEFORE THE HONORABLE SARAH D. MORRISON, CHIEF JUDGE
              TUESDAY, OCTOBER 14, 2025; 10:00 A.M.
                        COLUMBUS, OHIO

    FOR THE PLAINTIFF:
        Dominick S. Gerace II
        United States Attorney
        By:  Emily Czerniejewski
             Tyler Aagard
        Assistant United States Attorneys
        303 Marconi Boulevard, 2nd Floor
        Columbus, Ohio 43215

    FOR THE DEFENDANT:
        Flannery Georgalis LLC
        Michael Hunter, Esq.
        175 South High Street, Suite 1060
        Columbus, Ohio 43215

        Brian D. Joslyn, Esq.
        901 South High Street
        Columbus, Ohio 43206


                            - - -
    Proceedings recorded by mechanical stenography, transcript
 produced by computer.

2

Tuesday Morning Session

October 14, 2025

- - -

(The following proceeding was held in open court.)

DEPUTY CLERK:  Case number 2:24-cr-190, the United States of America versus Andres Tuccillo.

THE COURT:  Thank you.  If counsel will please enter their appearances, starting with counsel for the government.

MS. CZERNIEJEWSKI:  Good morning.  Emily Czerniejewski and Tyler Aagard on behalf of the United States.

THE COURT:  Good morning.

MR. HUNTER:  Good morning.  Michael Hunter and Brian Joslyn on behalf of Mr. Tuccillo, who is to my right.

THE COURT:  Thank you.  Good morning.  Good morning, Mr. Tuccillo.

Ms. Czerniejewski, what is the status of this case?

MS. CZERNIEJEWSKI:  Your Honor, on February 19th of 2025, the defendant entered a plea of guilt to possession of child pornography in violation of federal law.

That was entered pursuant to a Rule 11(c)(1)(A) plea, and we are here today for sentencing on that matter.

THE COURT:  All right.  Thank you.

Mr. Tuccillo, if you would stand again, please.

Sir, did you receive a copy of a document called a Presentence Investigation Report?

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

THE DEFENDANT:  Yes.

THE COURT:  Did you review the information contained in that report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Did you also talk with your lawyers about that report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  So we have the six unresolved objections.

Do you want to address that any further, Mr. Hunter?

MR. HUNTER:  Briefly, Your Honor.

THE COURT:  Sure.

MR. HUNTER:  Thank you, Your Honor.  It's really six separate objections kind of wrapped in one, and it's really about the cross-reference under 2G2.2C1.

And what I would say to the Court is I don't think that there is a bigger sentencing enhancement contained in the sentencing guidelines.  At least I'm not aware of one.  Really, it changes the relevant conduct in this case from a guideline range of five to six years up to statutory maximum of twenty years.

And when you think about 2G2.2, that guideline applies in all child pornography cases.  It has every provision that kind of covers every level of conduct.  Like, it already is -- foursquare covers the conduct here.

4

And if the cross-reference, which takes this into the realm of production, advertising, is going to be implied, I just think it should be applied on a case where there's not questions about the relevant conduct and whether they actually meet a preponderance of the evidence.  I think it's a close call in this case.

It's more of an equities argument --

THE COURT:  Well, I mean, okay, but to me the equities argument comes under 3553(a), right?

And so, I mean, as I -- I spent a lot of time looking at this, and so for -- because the cross-reference applies when the offense involves causing, transporting, permitting, or offering or seeking by notice or advertisement a minor to engage in sexually explicit conduct, producing a visual image, and I read that as pretty -- being on all squares -- what happened here, right?

He -- offering or seeking by notice or advertisement a minor to engage in sexually explicit conduct, how does that not apply to his correspondence with D.S.?

MR. HUNTER:  I would say for one reason, and that is there is no evidence on the record that it actually resulted in any new child pornography being created or --

THE COURT:  But I don't see the two -- what is the two -- I didn't write it down in my notes.  It doesn't require it to -- to be produced.  It says offering or seeking, and he

offered and sought.

MR. HUNTER:  That would take every chat case where somebody solicits an image of child pornography and put it in a realm of the statutory maximum.

THE COURT:  Right.  Right.  And whether we -- I mean, whether I think that's good policy, it probably isn't; whether I think it's good law, may not be; but I think -- I mean, we went so long without a commission.

I mean, this is kind of, unfortunately, for Mr. Tuccillo and his family, I mean, part of what we're talking about is, like, this mechanical application of the guidelines that looks purely at conduct and doesn't look at the -- necessarily the individual for what we're talking about here.

And so, to me, the question is:  As a matter of law, does the enhance -- does the cross-reference apply?

And I think, from a purely legalistic standpoint, you would agree with me that it does.

MR. HUNTER:  I think it can be applied if the -- by the precise reading of it.

THE COURT:  That's right.

But what you are saying is, from an equities standpoint, it's really not fair -- which I agree it's not in this particular case.

And -- and so I think when we start getting to the equities and looking at this particular case, I think that

6

falls under the 3553(a) factors.

MR. HUNTER:  You have heard my arguments then, Your Honor.

THE COURT:  Okay.  And I also -- as you know, Mr. Hunter, I never want to cut you off, but I feel like at the first step of this process, it is -- it's formulaic, and it's kind of -- not always, but it's usually black and white:  Did he -- and for in this case -- offer or seek?  And I think he did both.

MR. HUNTER:  We've briefed this comprehensively, Your Honor, and so I know the Court has already read those arguments, so we would stand on those.

THE COURT:  Okay.  All right.  Based on that discussion, Ms. Czerniejewski, do you feel the need to add anything?

MS. CZERNIEJEWSKI:  No.  I did just want to note one thing, Your Honor:  These are actually, I think, two categories of objections because the vulnerable victim application is a Chapter 3 enhancement and not a Chapter 2.

THE COURT:  Yes, I agree.

MS. CZERNIEJEWSKI:  So it wasn't Chapter 2.  I have nothing to add to my argument.

THE COURT:  That was actually going to be my next question for you, Mr. Hunter.

So, we also do have the two-level increase, which I

7

don't think is affected by the cross-reference about whether Mr. Tuccillo knew or should have known the victim was a vulnerable victim.

MR. HUNTER:  Your Honor, our position would be that if it would have applied under 2G2.2, then it has to apply under the cross-reference as well.

THE COURT:  All right.  To the extent that is a separate objection, that is overruled.

I do think the victim's unusual vulnerability is not her age, but it was the assault was perpetrated by her brother, so you have the familial relationship and also the living arrangements that added to the unusual vulnerability.

So, with that, I do adopt the statement of facts and conclusions reached in the Presentence Investigation Report as my own.  This does result in an Offense Level of 41 and a Criminal History Category of I, and so the guideline sentencing range, before we talk about any -- the motion for departure, or the 3553(a) factors, is 240 months of incarceration, which is the statutory maximum sentence.

I have read the government's and the defense's sentencing memos.  Of course, the defense did submit some materials from doctors as well as letters from family members and friends in support of Mr. Tuccillo.

So I will now listen to any additional arguments, and I understand, Mr. Hunter, that Mrs. Tuccillo would like to speak.

MR. HUNTER:  Yes, Your Honor.  Mr. Tuccillo has many family members here today, but his mother, Susana, would like to speak to the Court.

THE COURT:  All right.  Ma'am, if you would come to the podium please.

DEFENDANT'S MOTHER:  Thank you, Your Honor, for this opportunity to speak.

THE COURT:  Absolutely.  I just ask that you go slowly so the court reporter can keep up with you.

DEFENDANT'S MOTHER:  Absolutely, and I'll try to be as clear and loud as possible.

Again, thank you for this opportunity, Your Honor. First, on behalf of my family, I apologize to the Court and society at large for my son's conduct and the consequential use of the people's resources.

I wholeheartedly apologize.  More sorry, I could not be.

My son accepts responsibility so profoundly, and we stand by him as he navigates his commitment to atonement.

We are a very private family, so standing in front of you is quite difficult for me as a mother, but I humbly offer a few words that might help you illuminate the circumstances at hand.

I'll start by sharing that if my son had been born ten years earlier than he was, he would have only lived a few days. His birth defects were so complex, and the tools and skills

that saved his life simply didn't exist a decade before. But they did. And Andres was able to grow up in and out of children's hospitals. It was taxing, but Andres put on a brave face, and I felt very lucky.

But then came 2021 and the discovery of an aneurysm pulsating near my son's heart ready to burst. It was grave news, but we were so used to it that we just sort of proceeded as usual. Yet, at times, unfortunately, this time, things did not go smoothly.

As I slept in a family room, a shaking Code Blue woke me. A wall phone rang immediately after, and I knew it was Andres. There had been a frantic attempt to resuscitate him. He was chemically paralyzed so he couldn't move. But before darkness overtook him, he heard everything, everything the nurses were saying, everything they were shouting, particularly that this kid is going to die over and over again.

He and I have never been the same since that episode. Tragically, the aftermath knocked Andres off his usually resilient game. The trauma consumed him.

For the first time, I reached out to a therapist, but, unfortunately, I was 20 years too late for, you see, kids like Andres are very good at hiding their emotions. Everything seems fine but it isn't, and the medical community is only now trying to catch up as more and more of these children grow into adulthood.

10

In the last few years, an urgent call to arms by the American Heart Association insists that a proactive interplay of neurologists, psychiatrists, psychologists, and therapists join cardiologists in attending to these children -- especially at moments of transition, like adulthood. Otherwise, the resilient well that these kids have dug for themselves eventually goes dry, and they're left at the mercy of crushing mental illness and cognitive impairment.

I realize that it may be hard for some people to grasp, given that my husband and I were professionals, but my husband and I were wholly unaware of these vulnerabilities.

We recognized Andres' intellectual disabilities, but we never considered mental health support. Andres seemed so grounded to us, but, sadly, he wasn't. He had always needed our help.

And so, to make a very long story short, I respectfully assert that if it hadn't been for years of unaddressed childhood trauma, his debilitating near-death experience and its psychological fallout, and, most importantly, the lack of psychological and neurological support as my son entered into adulthood, he would not have committed the so very serious crime at issue.

My husband and I are imperfect people, and we missed it. And in some cases, like this one, it isn't just one family that is affected.

11

But with all this said, we did get some things right, and that is Andres himself, who he is, opposed to what he did over a few days. We don't excuse or condone. Not at all, Your Honor. But I believe that character matters.

As an immigrant, when I strove to impress honest hard work and good citizenship upon my children, Andres listened and persevered. He's a gem to be around, and you wouldn't want to be loved by anyone else when life throws those fastballs it invariably does.

There's no way I can change the past and make it less painful for the vulnerable at hand. All I can do is look forward and move heaven and earth to prevent future progression and misconduct. Andres wholeheartedly joins me in this sentiment.

Thus, I conclude by saying that Andres has grown up a lot in the last four years. He's never out of the woods when it comes to his heart. The abnormally small arteries that lead into his lungs, they remain unattended at the moment. Heart failure is a daily concern for us, but Andres works hard with his therapist, diligently takes his medication, and participates in a new mentorship program for adults with congenital heart defects. And, therefore, he is successfully managing his trauma.

As such, I humbly ask that the Court consider the aforementioned and allow my son the chance to make amends under

12

our supervision and devotion.  Thank you.

THE COURT:  Thank you.

Ma'am, tell me who you have with you here today.

DEFENDANT'S MOTHER:  Today, I have my daughter Teia and my husband Nick and my other son, Nico.  We have another daughter, but, unfortunately, she couldn't be here.

THE COURT:  Thank you all for being here.

DEFENDANT'S MOTHER:  If you have any questions, I'm here.  Otherwise, I'll let you get back to it.  Thank you.

THE COURT:  Mr. Tuccillo, you are not required to say anything before I sentence you, but now is your opportunity to say something if you want to do so.

You need to please stand, though, to do that.

THE DEFENDANT:  Yes, Your Honor.  Thank you.

Your Honor, I have long considered how best to express to this Court the immeasurable regret I feel regarding my heinous actions that broke society's trust in me.

As I pondered this, I came to realize that simple honesty may speak the loudest and clearest.  I am so sorry for what I did.

When I think of the pain and fear I caused a child, and the members of my family, my heart just breaks.

Your Honor, I now stand on the shoulders of giants -- my parents, siblings, grandparents, and mental health professionals -- and fully understand the unempathetic nature

13

of my offense.

I am committed to doing more than wallering.  I stand before this Court in all humility and make a solemn oath that I will spend the remainder of my life illuminating the darkness I wrought through empathy and good works.  I will strive to leave this world a little better than I found it.

Thank you.  And once more, I'm sorrier than Your Honor could ever know.

THE COURT:  All right.  Thank you, Mr. Tuccillo.

Mr. Hunter, do you want to add anything?

MR. HUNTER:  Yes, Your Honor.  Your Honor, I think, like most lawyers, most days I think being a district court judge must be a pretty good job.  Today is not one of those days.

THE COURT:  No.

MR. HUNTER:  I recognize this is a tough case.  These are tough decisions.  I think there are strong equities pulling in opposite directions.

I do think that this is that rare case where you have such extraordinary physical impairments and medical conditions, that that's one of the factors that should drive the sentence in this case.

I hope the Court will indulge me a little more than usual.  I think these sentencing issues are kind of multifaceted, and so I want to take my time to go through them

14

a little bit.

THE COURT:  Sure.  And then let me -- I want you to do that, and then before you are done, do you want to go ahead and then talk about the downward departure motion too?

MR. HUNTER:  Yes, Your Honor.

THE COURT:  But I would like to just kind of have you do your prepared remarks and then the downward departure discussion.

MR. HUNTER:  Yes, Your Honor.  I prepared remarks on everything this morning.

THE COURT:  Oh, great.  Great.

MR. HUNTER:  The -- I think you begin with 3553(a), those factors in the sentencing guidelines that starts us at the nature and circumstances of the offense and you juxtapose that against the history and characteristics of the defendant.

I think the facts of this case are unusual.  I think it's unusual this conduct occurred only over a period of four days, that you don't have a collection.  I think that's very unusual in these cases.

I think the amount of images you'll see, between 10 and 150, is as low as you will ever see in a child pornography case.

THE COURT:  Well, I hate to interrupt you, but I will just -- I do not accept the premise that this conduct only took place over four days.  And, yes, that's what the plea is

for. That's the charged conduct.

But the -- we have no evidence where he got the images that he sent to D.S. He got them from somewhere at some point in time. I think the only inference is that he got them before this four-day period.

And so -- I mean, my understanding of the evidence is that there was a new phone and there was some changes in the equipment that Mr. Tuccillo had, so we weren't able to necessarily get the full picture, and I am not -- and I don't think it's fair to him to assume that he had caches of images, but it certainly is fair to note -- to know that before this four-day period, he got at least a dozen or so images because that's what he sent to D.S.

MR. HUNTER: I think that -- I think that generally that's not how relevant conduct works.

I understand what the Court is saying, and certainly those are the inferences the Court can draw, but we don't catch somebody with a kilo of heroin and say: "Well, it's only a kilo of heroin, but you must have been super-involved in order to get to this point."

THE COURT: No, no, no. That's very different, and this is a dialogue, because I would like to hear the response.

Heroin or cocaine or whatever is fungible. So when I sell what I have, I have to go actually get more to sell more. Here, we have images that he had somewhere on some sort of

device that then he sent to D.S., presumably -- unless he took the affirmative action to delete it after he sent it, but even if he did, I don't care, because he got it from somewhere before.

So, just like for, I guess, their cocaine analogy, if I have a kilo of cocaine that I'm selling, we know that you got it -- I got it from somewhere.

MR. HUNTER:  Didn't grow it here in Ohio.

THE COURT:  That's right.  I didn't make it in my backyard, and so I would say the same for the image.

MR. HUNTER:  Then I would say, I think, that at least one limiting principle on that is if there's only a handful of images, I don't think that necessarily points in a direction of, like, a large cache of them.  Like --

THE COURT:  I agree.  And it doesn't necessarily mean that he had been doing it for years, but it -- but it does mean that sometime before this correspondence with D.S., he had procured images somehow, downloaded them, somebody sent them to him, but he had them to send them.

MR. HUNTER:  I understand the Court's inference that they are drawing there.  I would just say that that should be limited because there's very few images involved in this.

THE COURT:  Okay.  I'll agree with you there.

MR. HUNTER:  So, you know, sometimes I think it's useful in cases like this to talk about all the things that the

case is not.  This is not a production case.  This is not a collector case.  This is a chat case.  It's not a commercial production case.  It's not a traveler case.  It's not a case where this defendant is responsible for hands-on offenses.

And so I do think that that puts this -- that child pornography cases exist on a continuum.  I think this is at the lower end of that continuum.

And then you juxtapose that against the defendant's history and characteristics.  The -- there's no criminal history here.  I don't know that that's necessarily that unusual in these cases --

THE COURT:  No.

MR. HUNTER:  -- to be honest with you.  But you do have somebody who has very strong family support, that has -- is a college graduate, is maintaining graduate work.

I do think that those things balance out somewhat.  At least it mitigates the seriousness of the offense or the nature and circumstances of the offense somewhat.

THE COURT:  Right.  Although you talked about my hard job today.  Your hard job today -- I mean, so the family support, I struggle with.  I mean, I appreciate Mrs. Tuccillo being here.  I know his father was here when we had the bond hearing, but that also in my mind cuts both ways because -- at least as he has indicated in the presentence report, there is allegations that the older sister molested him when he was

18

nine, and so there was -- if true, and I don't have any reason to think he was lying about it, there were problems in the home.

And what he said in his chats about what he wants to do with his younger sister causes me a lot of concern about the family support, and both the relationship with the older sister and the relationship with the younger sister, and is the younger sister at risk.

So, to me, the family support causes concern.

MR. HUNTER: Yeah. I think I would respond to that by saying that was then and this is now.

THE COURT: Okay.

MR. HUNTER: And then I think that, you know, you had Susana stand here before you and tell you that the focus of the family for so long was on the physical well-being and just getting him from doctor's appointment to doctor's appointment -- that maybe some things that should have been caught weren't caught. Maybe some things that should have been noticed weren't noticed.

I don't think that's where we are with this family today and him moving forward, and so I do think that speaks to the lack of concern about a recidivism. I do think that he's getting counseling and treatment. I tried not to bury the Court under those reports, but there's a lot of that going on.

And so, I think, to the extent that that existed in the

19

past, I don't think that that exists anymore moving forward.

THE COURT: Okay.

MR. HUNTER: The Court touched on -- we have argued for basically three kind of departures in this case, and I think it makes sense to address those now. There's three separate bases for departure.

THE COURT: Sure.

MR. HUNTER: The first is the defendant's youth. In November of '24, the Sentencing Commission finally amended the guidelines, and I think the guidelines kind of caught up with where social and behavioral science have been for a long time, and that is, people in their early 20s haven't fully developed cognitively yet, and some of the hallmarks of that lack of cognitive development are impulsivity, risk-taking, susceptibility to outside influence -- in other words, just an inability to appreciate the consequences of your actions. And this is not a legal defense. This is not a "we're trying to escape culpability" here. But I think it's a factor that warrants consideration.

Andres was barely 21 years old on the date of the commission of this offense. I think that that's a fairly young defendant as you are going to see in a federal district court case.

I think that that is something the Court can take into consideration. It's something that the sentencing guidelines

specifically mention. And, again, I think they amended them in '24, and they finally caught up with where a lot of social science has been over that time.

I think that his youth and inexperience is the only thing -- one of the only things that can -- that can explain very aberrant behavior from a period of time following a series of traumatic events.

I think it actually kind of works in conjunction with the mental health issues in this case, and that's kind of where I'll go next, Your Honor, and that is -- and, to be clear, I do think these things build on each other. I wouldn't come before the Court and say that youth, standing alone, would be a sufficient basis for a departure in this case, but I think it's one of the factors, one of the criteria.

When we talk about mental health, I think both during the time of the commission of the offense and continuing, I hope that we have presented to the Court a sufficient record that there is a recognized basis for a downward departure deviation based on the mental health issues in this case.

Andres was suffering from a reduced mental capacity. Not a legal defense, I recognize. We're talking about mitigation. At the time of the offense, I think there were reports of -- Dr. Preen and Dr. Zachariah describe in their words a "psychotic break" during 2021 during this time.

Again, we're not making an insanity defense or trying to

backdoor our way into something like that. I think this is only relevant as the basis for a downward departure. I think that it's coupled with the near-death experience, the PTSD, and anxiety during that time.

During the time of the commission of the offense, I think the record establishes that there was some diminished mental capacity during that time. I think that the letters in this case -- I hope the Court has had time to read them all. I think they are as insightful as anything that I've seen in explaining that, because Andres put on such a brave face about all of the medical treatment, that the mental health treatment was just not something that was on their radar with all the things they were dealing with over that time.

That's not to blame anybody. That is to say I think it's just a fact when you are dealing day-to-day with heart issues and the possibility of heart failure, I think that some things got overlooked in his mental health treatment, and I think now that he's getting treatment, those things are being recognized and they're being taken care of.

I think that it is something that the Court can take into effect when you talk about -- in conjunction -- particularly in conjunction with his youth at the time of the offense as a basis for a downward deviation. But I think what really drives a sentence here is the extraordinary physical impairment.

22

I don't recall -- I've been doing federal child pornography cases in district court since probably 2004, and I don't recall ever seeing in a case where we had a defendant that had this pronounced of a medical history and medical issues moving forward.

It's been identified by the probation basis as the -- rather, by the probation department as a proper basis for departure in this case. I think that's pretty rare. I can't remember the last time I saw that.

I hope that the record establishes for the Court that there is a significant medical condition here. I tried not to bury the report -- the Court under medical reports and doctors' reports. I thought the PSR was very comprehensive in this case, and so because of that, we're relying on a lot of that information.

So we kind of tried to hit the sweet spot of not burying the Court but establishing, like, the significant physical limitations and medical conditions that Andres deals with every day. It requires constant medical monitoring and treatment and is very likely to require future additional surgical intervention. It is real, it is ongoing, and it is grave. I think it meets the definition of extraordinary physical impairment in every -- impairment in every sense of that word.

I want to particularly point the Court towards the letter of Dr. Leopold who has been Andres' treating physician

23

for his entire life.  It's not only highly specialized treatment that's required, but it's highly specialized monitoring that's required.  And according to Dr. Leopold, it's only about 20 or so facilities in the United States that even have the capacity to do this type of monitoring.

Even with that meaningful treatment and meaningful monitoring at some of the best facilities in the United States, it's still very likely that this is a congenital disease that's going to require a valve replacement surgery at some point in the future.

I guess I would say it this way:  Even with the best access to the best medical care in the country, funded by private insurance, with parents that are attuned to watch his every kind of medical move, they barely kept Andres alive for these 24 years, and I think the cases, like *Pineiro* and *Kravetz* that we cited, say that when the defense has put forward substantial evidence of a significant extraordinary physical impairment, the burden then kind of shifts to the Bureau of Prisons to, like, give the Court some rationale or some explanation for how you are going to care for this person with this acute medical condition.

The courts in *Pineiro* and *Kravetz* both kind of took the government to task for just boilerplate assertions.  We don't even have boilerplate assertions in this case.  There's no evidence on this record at all that the Bureau of Prisons has

24

the capacity to treat Andres.

I stood before the Court in June for a status conference, and I turned over to the Court weeks of emails of me trying to get the Bureau of Prisons to make an evaluation to provide that information for the Court, and they didn't do that.

I think the government doesn't address in their sentencing memo the B.O.P.'s capacity, and I think with good reason: Anybody who has ever been associated with the B.O.P. can't believe that they have the capacity to handle something like an acute congenital heart condition.

And if you don't believe me, you can go with the DOJ's Inspector General report in 2024. They evaluated it. I cited it in our sentencing memo. The Federal Medical Center at Devens, like the crown jewel of B.O.P.'s medical, and out of six physicians, they had one on duty. Three head positions were vacant. Two were on extended leave. They had one physician to manage the care of 941 inmates there. And particularly with Andres' condition, you are going to have to have offsite evaluation and offsite procedures, offsite visits. I don't think there's any question about that. The DOJ IG looked at 57 scheduled outside medical appointments and found that the average of them being delayed was 53 days overdue.

Now, 53 days overdue for a doctor's appointments for treatments is probably not ideal in any situation, but it's

potentially fatal in a situation with Andres and his heart condition. And so anyone who follows -- and so I think that there's real questions about what -- the B.O.P.'s capacity to do that.

And sometimes it matters, not only what happened, but when it happens. You can't watch the news these days without seeing, like, all of the federal cuts, of all of the federal retirements, of all the federal government. We stand in federal court this morning, and in the well of this court in a two-week long government shutdown, with no sign of it ending.

If there was ever a time that the B.O.P. had the capacity to treat Andres' medical conditions -- and I doubt that there was -- it certainly is not today with all of the cutbacks.

I was just looking at the "Washington Post" yesterday morning. This was a headline that popped up: "Historic wave of retirements is putting huge strains on the federal government. Tens of thousands of federal employees have taken retirement or their voluntary departures on top of the administration's latest layoffs."

I think if there was ever a time where the Court needs that information about what is the B.O.P.'s capacity, it is now. I think there are grave reasons to doubt that they would have the capacity to treat this condition and the conditions of Andres in this case. I think that, for that reason, a sentence

of home confinement is an option for the Court in this case.

These are my last two points:  We are not asking the Court to break any new ground here.  If you look at 3553(a)(2)(D), it states:  "The effective provision of necessary medical care is a proper consideration for sentencing."

You look at 5H1.4 of the guidelines.  It instructs that home confinement may be a preferable sentencing option for a seriously infirm defendant.  I think that's what's presented here.

We have provided you with a litany of cases from five different circuits where courts have imposed and upheld sentences of home confinement based on extraordinary physical impairments, on defendants in almost every case that I would argue have much less medical -- grave medical conditions than Andres does.

I would just say it is well within the Court's discretion to impose a sentence of home confinement in this case.  It is supported by 3553(a).  It is referenced and supported by the guidelines, and it is supported by case law.

I think we've drawn the Court a road map of how to do it if you want to.

This is my last argument:  Andres is charged with a zero to twenty-year offense.  When you sit down with the client to tell them about possibilities, you say:  One of the

27

possibilities is twenty. One of the possibilities is zero. One of the possibilities in a zero to twenty offense is zero years of incarceration.

We are not asking for Andres to get a pass for this offense or to avoid punishment. We're simply asking the Court to substitute home confinement for imprisonment so that he can continue to get the medical treatment that he needs to stay alive.

At page 37 of our sentencing memo, we referenced the *Moss* case and kind of the litany of conditions that Judge Barrett applied there, just as an example of how restrictive the Court can make home confinement. That was pretrial confinement in that case, but I think it applies nonetheless. I think the amount of conditions and restraints that the Court can impose on Andres is limited only by the Court's imagination.

You can turn a sentence of home confinement into the functional equivalent of incarceration, yet still allow Andres and his family, through their private insurance, to access the health care that he needs. You can make him sit in his room and read books for five or ten years, whatever the Court wants.

We already have four years almost to the day since the date of the offense in this case. There's been no new offenses. He's been on pretrial release for many months in this case. There are no new offenses.

So I think the Court can impose the kind of sentence that is on a period of home confinement that would be the functional equivalent of incarceration.

We ask the Court to find that this is that rare case. Maybe it happens once a decade, where you have somebody with these kind of medical infirmities come before the Court.  It rises to the level of extraordinary federal -- extraordinary physical impairment, and I think it's well within the heartland of the case law in these cases for a sentence of home confinement.

We ask the Court to find that the B.O.P. is unlikely to be capable of providing the necessary medical treatment and that a sentence of home confinement with whatever the conditions the Court wants to impose will make the Court confident that Andres can be -- the public will be protected and that Andres has an opportunity to care for himself and to be rehabilitated.  He's well on the way to all of those things. That's to be followed by a term of supervised release.  That would be a term that's sufficient and not greater than necessary in the case.

And this is really the last thing I'll say.

THE COURT:  No, you are fine.

MR. HUNTER:  Andres was -- just turned 21 when this offense happened.  He stands before the Court today not yet 25 years old.  Because of his congenital heart condition, a

29

sentence of incarceration in this case would likely be the functional equivalent of a death sentence. Andres deserves punishment in this case. He doesn't deserve to die in prison.

THE COURT: You know, when we had that status conference that you referenced, I think that you said it was in June, you know, one of the things we talked about was that, yeah, that the B.O.P. would not do a prescreen. They wouldn't do it until he was sentenced.

And so, if you are right, and the B.O.P. cannot handle his unique medical conditions, at that point do -- I mean, do you know and do they say, "We can't do it, let's do home confinement?" I mean, at that point is it a motion for compassionate release? What is your understanding of what that process would be?

MR. HUNTER: I think I've only had this situation one time in my career, and it was a case many years ago, and they -- we reached out, and it was Judge Smith. He actually ordered the B.O.P. to reply.

It was a case with Dave Thomas and Bill Meeks when Bill was still alive, and they did reply. It was somebody who was a quadriplegic, and they're like: "We have one facility in the entire country that can kind of house those people."

But we had that information prior to sentencing, because -- and I thought that was very relevant information for the Court to know before a sentence was imposed. Otherwise,

30

you are imposing a sentence of incarceration and saying: "B.O.P., come back and tell me if this is even possible."

I would rather the Court have that information before it imposed a sentence. I would think that would be a factor largely into the Court's decision.

THE COURT: All right. Thank you. Ms. Czerniejewski.

MS. CZERNIEJEWSKI: Thank you. Is it okay if I kind of go in the same order that --

THE COURT: Whatever order you want.

MS. CZERNIEJEWSKI: I don't want to belabor the factors of this case. They are outlined in the PSR, the statement of facts, the sentencing memos, and the arguments that we've had before Your Honor.

But one of the first arguments is that this -- the factors that Your Honor has to consider is the nature and circumstances of the offense, and this case is being referred to as not a production case, and I wholly disagree with that. There is some advertisement here.

But when you actually look at the production of child pornography statute, the elements of that are met, and that was recognized by the government at the time this case and this investigation was initiated.

In the world of federal child exploitation cases, there are kind of three categories of cases that are charged by the office and, unfortunately, I'm mainly the person that handles

them.  So these are the kind of silos:  Individuals who are in positions of trust and authority, individuals who have a prior conviction for offenses against children, and then those who produce child pornography.  And Mr. Tuccillo is in that final category.

When this case came in from the lead from Tennessee, we were informed through the chats in the investigation that it was Mr. Tuccillo's request for the nine-year-old victim in this case to be sexually assaulted that generated images in this case.

THE COURT:  Are you familiar with the cat's paw?

MS. CZERNIEJEWSKI:  The cat call?

THE COURT:  The cat's paw.

MS. CZERNIEJEWSKI:  I'm not.

THE COURT:  It's kind of an employment law concept, but it comes from a fable, and where the cat got the monkey to do things for it, so it's kind of vicarious -- not vicarious liability, but it's where you have somebody else kind of do your dirty work.

MS. CZERNIEJEWSKI:  Yes, and I -- Mr. Tuccillo was not physically hands-on, but he did go tactile in this case.  And so when we look at the nature and circumstances --

THE COURT:  You said "tactile"?

MS. CZERNIEJEWSKI:  Tactile.  That's a Judge Marbley word.  I apologize.  I just was arguing, but it means that he

32

went from just fantasizing about it to acting on that fantasy and, essentially, becoming hands-on with a child.

I note that because this is not --

THE COURT: Through a surrogate. That is maybe a better word, a surrogate.

MS. CZERNIEJEWSKI: That's probably a --

THE COURT: Okay.

MS. CZERNIEJEWSKI: But I note that because that was immediately recognized by the government in this case.

This was a 15- to 30-year offense. The production of child pornography, the solicitation of child pornography resulting in the sexual assault of a child, is a 15-year mandatory minimum charge.

So I think Your Honor kind of hinted at this, but in the government's mind, this was never a four-day offense. You don't just open a chat one day and solicit the sexual assault of a child. This is an ongoing mentality that somebody had to have had, and I think that's confirmed by the defendant himself who recognizes that he had sexual fantasies for his own sister. He recognized that he had sexual contact with one of his siblings as well; and, furthermore, he also solicits the sexual -- the attempted photos of the nine-year-old's younger sister, the five-year-old, and the chats that were supplemented -- this isn't just limited to one victim. Had the nine -- the 16-year-old in Tennessee been able to generate

images of the five-year-old, this might be a two-victim case.

So, in a vacuum, when you look at what was actually done in this case, it was not a four-day offense, just limited to a lapse of judgment.

That's the words I took most issue with in a lot of the professional letters that were drafted on behalf of the defendant, that in 2021 he had a weeklong lapse in judgment. It was a hard moment, and he did the worst thing.

That goes against any child exploitation case I have ever seen in my entire career, and that predates my time as a federal prosecutor. It goes back to my time in Cook County. This is not --

THE COURT: This is against -- it goes against reality, common sense, whatever word you want to say, as you heard my question to Mr. Hunter --

MS. CZERNIEJEWSKI: So when you -- and that's exactly it, Your Honor. And child exploitation defendants -- and I put some of the cites in my sentencing memo -- have the highest rate of recidivism.

This is not a case where, if an armed robbery, you rob one store and -- because you needed money that day. There is something deep-rooted in those who have a sexual attraction to children. You don't just wake up one day, have it, and then have it go away. And if we don't acknowledge this here, if Mr. Tuccillo and his family and his support don't acknowledge that

34

there is something that is deep-rooted in relation to his attraction to younger children, then he is never going to be rehabilitated.

So when we go to the nature and circumstances of the offense charged, I would note that it is rare to have so little number of images. But when you have the two silos of types of offenders, those who download it and collect mass amounts of child pornography that they just pull off the internet, and those that actually create it, the fact that he has less images means nothing because the creation or the solicitation for the sexual assault of a child is the most serious.

Nature and circumstances of the offense, in contrast with the history and characteristics, is honestly why we're here today, and I want to make it clear that all of the medical anomalies that Mr. Tuccillo has faced was taken into consideration at the time this case was initiated.

Mr. Joslyn reached out immediately upon the search warrant being executed at Kenyon College in Mr. Tuccillo's dorm room and said: "Listen. You know, this case is different. Just hang tight."

And I don't want to get into the plea negotiations, but it was very forthcoming, and I put this in my sentencing memo 'cause I don't think it's something I'm hiding the ball on, that I made the representation that this is a 15-year mandatory minimum, and the -- Mr. Tuccillo's attorneys very much said:

35

"Just wait.  This guy is different."

And when you make a charging decision, you want to encompass the history and characteristics of the defendant, and that was what was done in this case.  Mr. Tuccillo has already received a benefit of the bargain, removing of the 15-year mandatory minimum.  Even distribution of receipt, you have a five-year mandatory minimum, and we know he did those.

So we have taken away the mandatory minimum to give the attorneys the opportunity to argue why a lower sentence is warranted.  But when you actually peel back the layers as to what has been submitted, I think that there are gaps in the arguments for why a term of home confinement is warranted here.

He has had all of the family support in the world -- in fact, more than any defendant that I have ever seen in federal court.  And I don't mean to offend anybody, but he has had the wealth for services, for experts, for assessments, for medical care.  He has had the education.  I mean, he has, I think, a neuroscience degree, so he has the intelligence, the educational wherewithal, and he has been able to exist out in the world for 21 years -- despite these medical anomalies.

So when you look at the history and characteristics, we're up against this individual who has had every opportunity to be supported or have been supported and be successful, which is a reason to say that his history and characteristics are not a countervailing argument to home confinement.  In fact, it's

36

the opposite.

We have somebody who should not be in this situation, but here we are, and I think when we look at -- and I want to break this down a little bit by the guidelines, but we have an individual, again, who is a little bit of an outlier.

He is young, he has medical issues, but he had had decades of assistance that I have never seen in a case where somebody that is being sentenced in a child pornography crime -- which kind of leads me to the next part of my argument as it relates to the youth of Mr. Andres. That guideline is not meant for somebody who is just young. You don't get a deviation or departure because you are young.

That guideline -- I think it's been applied just a few times in the Southern District of Ohio, specifically this court in Columbus, when you look at somebody like a postal robbery of a mailman, or an armed robbery, where you have a gang recruiting a 17- or 18- or 19-year-old who is living in, like, a poverty -- in poverty with no family support. They are just trying to kind of make a name for themselves in conjunction with the group that they are in. That's not this case.

It's also not this case because child exploitation cases are different. One of the factors you have to consider is whether or not he was unduly influenced by others to act, and he was not. These were his decisions.

Child exploitation cases are unique in that they are --

37

they are committed in the confines of one -- one's own individuality, which means Mr. Tuccillo acted alone. Obviously, he solicited through another individual. But these were the decisions that he made in this case.

And when you look at the factors that the Court is to consider when applying that deviation or that departure for youth, it's not applicable here.

Now, let me get to his mental health. I am not a mental health professional, and I will never advocate that somebody's mental health is not serious enough. I will just say this: He has depression, anxiety, and PTSD, and I understand why based on the reports submitted to the Court.

What is hard for the government to wrap its head around is that the argument from the defense is that he was so diminished, because of his mental health conditions, when he engaged in these child exploitation activities, that we should consider a deviation from the guidelines. When you take that argument and you actually look at who Mr. Tuccillo was in college, it's a 180.

I submitted as an exhibit the -- a tiny portion of the text messages that were pulled from Mr. Tuccillo's phone, and I don't care that he sold weed. I don't care that he drank. I don't care that he partied. That's not why we are submitting these. But the person that you are seeing goes against what the professionals that are evaluating him know or understand.

38

So, for example, one of Dr. Zachariah's reports says that he's unable to socially connect. He's isolated, depressed, panic-stricken, extremely insecure. And I just want to note that when you read these reports in a vacuum, it appears that Mr. Tuccillo is sitting in a dark room by himself all alone without any social interactions, any peer activities, and any success in his studies.

And that's opposite of what we see. He is interacting with friends. He has a whole group that he's connecting with. And what we see from his own device, from his own world, is not quite the picture that the medical experts he's hired have painted. In fact, he was so successful in college --

THE COURT: I'm sorry to stop you. Was that an exhibit to your sentencing memo?

MS. CZERNIEJEWSKI: Yeah. So it was referenced on -- Government Exhibit 1 is noted at the bottom of page 10, and then it was submitted as an exhibit, and it was an outline of text messages from his time at Kenyon College.

THE COURT: Okay. I -- what I -- with my printed materials, I did not look at the exhibits. I will take a break and look at it. Do you have an extra there?

MS. CZERNIEJEWSKI: I do, yes, Your Honor. May I approach?

THE COURT: You may, please. I apologize. I did not get that.

39

MS. CZERNIEJEWSKI: And, again, this is only being submitted to highlight what was going on in his life at the time that he was soliciting the sexual assault of a child, and what we see is he's not drug-addicted. He smokes weed, and he drinks with his friends in college, and I -- not to minimize that, but that is pretty typical for a college student, and that leads me to kind of -- the next argument is that he was successfully able to attend Kenyon College and graduate with an advanced degree despite these mental health issues.

The threshold is that they have to be so debilitating that you cannot effectively make a decision for yourself in -- in the actions or the crimes that you are committing. That something about the mental health that you are suffering from is so debilitating that you could not have made the correct decision because of this. And that just is contrary to the own life that Mr. Tuccillo was living.

And I'm not saying that you can't be depressed, anxious, or have PTSD in the privacy of your own home. I know that text messages don't reflect the actions or the well-being of somebody, but I also want to note that if any -- if the justification for a departure existed here, it would exist in almost every single case because, unfortunately -- and I cited this in my sentencing memo -- depression, anxiety, and PTSD is just the status quo for the United States, especially right now when we have a government shutdown.

40

But in light of that, these are the three most common diagnoses. The other thing I'll note is that --

THE COURT: It's that reason, thank goodness, that those are not the -- an automatic pathway to looking at child pornography or being engaged in child exploitive activities.

MS. CZERNIEJEWSKI: Exactly. I would argue that the majority of the population is not turning to child pornography to -- to -- because of these diagnoses. In fact, it's probably the exact opposite. They are advocating for something to be done about these types of cases.

But that leads me to kind of the final argument when we talk about his physical impairment and medical issues, and I would be -- it would be disingenuous for me to stand before Your Honor and say that he does not have medical conditions. Of course, he does. That he's not had serious medical histories and trauma, of course, he has.

What I will say is that there's much made about what happened when he was born, and the follow-ups that have had to occur since, and I don't want to take away from any of that. I'm a human being standing here too. I understand what he has gone through.

But as a justification for a departure down to home confinement, in conjunction with the 3553 factors, I just don't think that the evidence supports it, and it comes from what I just submitted to Your Honor, that -- the argument is that he

41

cannot go to the B.O.P. because he effectively cannot function away from his medical team, his doctors. He needs to be monitored. He needs to have appointments, but yet he was able to successfully be away from his family for five years at Kenyon College.

It's in a separate state. He's away from his doctors. He's away from his medical professionals, and he's doing what he needs to do in college. And if there is an appointment that he needs to attend or something that needs to happen, like the event in 2021, it's taken care of. And that's a -- that's effectively what the B.O.P. would do, except he's actually probably monitored more in the B.O.P. than he was at Kenyon College, because their entire job is to assess him and make sure he's safe.

I don't -- I did not go into whether or not the B.O.P. has the ability to treat him, because I think it's premature. He hasn't been assessed. I do know that he is obviously -- he has medical appointments, but the argument that he cannot go to the B.O.P. because they cannot treat him is counterproductive to what the history of this defendant's life has been. And, again, I point to those text messages which span his return to Kenyon College in 2021, where he picks up almost a normal life.

So we're talking about this unique incident that happened in 2021, this near-death experience, and we're using it -- the defense is using it as a tool or as a vehicle

42

to come down so far off of the guidelines which -- I'll just note, and I don't know if this was addressed -- the sentencing guidelines in this were actually 324 months to 405 months but the stat max caps it pursuant to the Chapter 5, so we're down to 240, and then the government is taking a decade off based on all of the history and characteristics in its request for a 120-month sentence.

But in noting that, he was able to return to Kenyon College and stay there for two more years and be successful. So we are treating his medical anomalies in a vacuum in order to avoid going to the B.O.P. because he has had incidents of medical trauma that were life-threatening.

I'll just make two more quick points. Your Honor has sentenced a number of individuals in child exploitation cases with significant medical histories. I don't want to go into HIPAA violations, but Your Honor just sentenced an individual by the name of James Davis. And I think in one of the public filings -- I double-checked I can say this on the record here, but he had stage IV terminal cancer and was -- on top of a slew of other medical diagnoses, and it was made very clear that he would have to be pulled out of the B.O.P. for his treatments, his surgeries, and be taken to Ann Arbor.

So when we look at somebody like that, who is actively, like, debilitating in a wheelchair, and a guideline departure was not warranted there, I would say it's even less so here,

43

and I cited some additional cases as to why that would be.

All in all, the defense is not asking for a pass on Mr. Tuccillo's conduct, but they are asking you to do something so significantly opposite of what the law intends, and that's just to send him home on an ankle monitor and make amends for what he's done through his service to the community from here on out.

I'll submit, and I believe this is in the PSR, but the individual who even -- who sexually assaulted the minor in this case at Mr. Tuccillo's request received a term of imprisonment. He was tried as an adult in that case, and so when we talk about --

THE COURT: He was 12 and he was --

MS. CZERNIEJEWSKI: I think he was 15.

THE COURT: I thought he was 12. Let me look right here. That's right. It doesn't matter. He's --

MS. CZERNIEJEWSKI: Fifteen-year-old juvenile is D.S.

That it is beyond the law and reasoning why this individual who helped solicit that other individual to commit the sexual assaults wouldn't be also subjected to a term of imprisonment.

Home confinement is warranted in certain cases. This is absolutely not one of them, and I cited some cases, but the Sixth Circuit has made it clear that child exploitation cases really are the outliers for home confinement.

44

All of the reasons why an individual who commits even a possession of child pornography case, where there's not the solicitation of a sexual assault, why these cases are so different than other crimes committed in federal law, that they -- that home confinement is almost never appropriate in any type of these cases.

I made additional arguments in my sentencing memos. I don't want to rehash now. But for all of the reasons we previously just argued in response to Mr. Hunter's notes -- commentary to the Court, I will ask that we are asking for a sentence of 120 months, which is well below in the actual and adjusted guidelines, deviating off for -- for -- noting the 3553 factors, but also taking into account who is sitting before you here, and it's somebody who committed one of the most serious crimes in child exploitation, you know, federal world, but also had all of the capabilities for avoiding this type of behavior, and who I truly believe, based on my reading of all of the letters in this case, has not really acknowledged the scope of his issues as it relates to child exploitation.

Your Honor has to consider specific and general deterrence when sentencing a defendant, and the experts in this case really -- the letters in this case really just highlight what Mr. Tuccillo has gone through and this brief moment where he just kind of decided to stop being a law-abiding citizen, and then they treat it as such an isolated event, and I think

Mr. Tuccillo and his family, based on the letters, have kind of done the same, but we're not addressing the deep-rooted sexual interest that Mr. Tuccillo has had through his own admissions and through his messages of what we know of, and that is the biggest -- that is the most alarming part of what I've seen thus far, is that we are acting as if this is -- this is an isolated incident that will never happen again, but that is contrary to what we know about Mr. Tuccillo and child exploitation targets.

So I will rest on that unless there's any further arguments or information the Court wants.

THE COURT: Thank you, Ms. Czerniejewski. Anything additional from Probation?

THE PROBATION OFFICER: Not at this time, Your Honor.

THE COURT: Okay. Mr. Hunter?

MR. HUNTER: Just a couple of things.

THE COURT: Sure.

MR. HUNTER: Thank you, Your Honor.

Your Honor, I think that it's easy -- I was Emily Czerniejewski before Emily Czerniejewski in these cases. It's easy sometimes to conflate every defendant with the worst form of the offense. And to say a request for production is the same as production or that a request for a video depicting a hands-on offense is the same as a hands-on offense, I just don't think that's true.

46

I think there are gradations of these offenses, and I think that it goes too far that you conflate that anybody who has ever requested these videos is themselves a hands-on offender.

I think that when we -- Ms. Czerniejewski talks about recidivism and how these people are irredeemable, the people that commit these offenses are the highest likely -- she's not a psychiatrist. He's being treated by multiple psychiatrists now, including a psychosexual psychiatrist. If there was ever a defendant that came before the Court that is taking the steps to make sure that they don't recidivate, it's Andres. He's in therapy for all of those issues right now.

When she talks about that Andres has had all of the support and all of these resources, clearly, his parents have done an amazing job of keeping him alive for this time. The mental health component of this treatment only started after 2021. It's only a recent phenomena that he's getting the mental health treatment.

THE COURT: But, Mr. Hunter, I mean, I'm sorry he didn't get mental health treatment earlier, but a symptom of mental health problems is not people going to -- looking at child pornography. It's just not.

I don't think it's -- frankly, I don't think it's fair to the family. I don't think it's fair to the victims or reality that the suggestion that not getting mental health

47

treatment was the cause of this offense.

And I know that's not what you are saying, but it certainly is the suggestion in my mind from the materials submitted, and from this idea that, "Oh, my gosh, if only we had gotten him mental health treatment earlier," I mean, maybe things would have been different, but I don't think the suggestion that -- because he was -- I mean, this is one -- one of the things that I will tell you, I fully agree with the government on, and that is depression, anxiety, and PTSD, all very serious and significant mental health issues, all three of which deserve and need good and appropriate treatment, but the suggestion that it's -- that these three things caused him this conduct, I -- also not a psychiatrist, not a psychologist, but I can't -- I do not and will not accept the notion that a person with these three things, "Well, it was inevitable that this conduct occurred because he didn't get mental health treatment."

Yes, mental health treatment might have not made this happen, but the fact that it didn't is not the cause of what occurred.

MR. HUNTER: I was making two slightly different points, Your Honor. The first point is that --

THE COURT: Okay. Well, please make them because --

MR. HUNTER: The only point is that when she talks about that he has had all of this support, the mental health

48

component of that support is only a recent phenomena is the only thing.

THE COURT: Okay.

MR. HUNTER: I will agree with you: I don't understand how it is that frequently mental health issues end up manifesting themselves in somebody seeking out child pornography, but that seems to be the case, that almost every defendant that I've ever prosecuted or defended, that has had a child pornography offense of conviction, has mental health issues. I don't --

THE COURT: I'll agree with you, but I will say about every defendant, whether it's a drug offense, whether it's a gun offense, where they are stealing their grandfather's Social Security, I will tell you that 99 percent of the defendants I see of every offense have depression, have anxiety, and the PTSD probably isn't 99 percent, but it's probably 90 percent.

So, I mean, I'll agree with you that these mental health conditions can cause aberrant behavior, but the straight connection to exploitive materials -- because people are self-medicating, they are doing other things, and this -- and this, to me, is a different level of criminal behavior.

MR. HUNTER: Understood, Your Honor. I just want to note -- I know it's important to the family. The issue of the chats and the seeming normality in college, I anticipated that argument.

49

If we were making an incompetence argument, then I would understand to say: "Well, it looks like he's making -- doing some plain and normal things out there." We're not making an incompetence argument.

We're only saying that the post-traumatic stress and the mental health issues manifested themselves in the conduct.

Ms. Czerniejewski said: "Look, child pornography is not an offense where you need to be influenced. You sit alone in a dark room and do it." And then she points to chats and says: "Look at him in college. He's not sitting in a dark room. He's doing it."

This offense is committed that way. It is a private offense. It is an offense of shame. And so I do think that you can't have it both ways on the chats. We're not saying he was incompetent so there could be no normal behavior --

THE COURT: I know you are not. And we also -- and I also -- maybe it's important for me to acknowledge that, not just for Mr. Tuccillo, but for other defendants for this conduct, I mean, you can be social, you can be with your family and loved ones, and then go to the room and do these things. I don't think they are mutually exclusive. And, in fact, I don't know how they could be.

MR. HUNTER: Two last points.

THE COURT: Yes.

MR. HUNTER: Ms. Czerniejewski has made a lot of the

fact that: "Well, look, he went to Kenyon College for all those years, and he couldn't have been getting the medical treatment there that the B.O.P. can give him."

Two responses: One is he almost died in 2021 because of the lack of medical treatment that he was --

THE COURT: Well, I mean, they found it because he was doing his routine exam.

MR. HUNTER: Yeah.

THE COURT: Yeah.

MR. HUNTER: But going away to college, and it manifesting itself and he did -- it was a nick of time finding the pulmonary embolism that could have killed him.

THE COURT: Okay.

MR. HUNTER: The last thing I would say is if it is true that the Bureau of Prisons has the capacity to treat somebody with Andres' conditions, let's get that information. Let's get that information for the Court's consideration in this case. Ms. Czerniejewski has assured me that the B.O.P. can -- can treat this. Let's get that information. I think that would inform the Court's decision.

What if she's -- what if I'm wrong and the B.O.P. can do this, okay, well, that takes the legs out from under my argument. I don't think that's the evidence the Court is going to get from the B.O.P. on this.

THE COURT: Okay. Well, let's do this. I mean, let

me say this:  I feel very strongly that this conduct deserves a period of incarceration.  Very much so.

As I've said, and I will say probably a couple of times, I just do not accept the premise that this was something that happened on four days, was a completely isolated incident, because I just -- I think, not being an expert in this field -- as I said, he had images to share.  They came from somewhere.  We don't know where.  But the inference is that he had them and access to them.

I also don't accept the premise that, oh, he just happened to be on Kik, and he found a 15-year-old kid to start having chats with and conversations with to encourage to do things.  I mean, these things don't happen without some foundation and some experience and evidence to get there.

So I just don't accept the premise that is just a four-day, oops, isolated incident.  That's not your language.  That's how -- but that's my characterization of the defense argument.  So I feel very strongly that this is a case that needs incarceration.

I am concerned about the health issues, and so let's do this:  I will continue the sentencing.  I will put a -- a little stop in this.

We've got the arguments.  We will reach out to the B.O.P., and I will have them evaluate him, and I want to know where they are going to house him, if they can house him, and

52

what we're going to do.

Yes?

MS. CZERNIEJEWSKI: Yes, Your Honor. There is a Project Safe Childhood, which is where child exploitation prosecutors live federally, a listserv email that came out on Friday, where two prosecutors were facing significant defense arguments about the B.O.P.'s inability to house their specific defendants, and there was a name of a go-to person at the B.O.P. that was provided --

THE COURT: Perfect.

MS. CZERNIEJEWSKI: -- who can give insight.

If it's okay, I have that information and I can send it to the Court or put it on the record now. But it might be -- it sounds like this individual is willing to provide that insight to the Court and has done so on two prior cases.

THE COURT: Okay. Yeah. Why don't you give us that name, and then we'll figure out whether -- maybe I have to put on a court order saying, you know, that my intention is to sentence Mr. Tuccillo to incarceration, but I need -- but I want him to get evaluated, because I do have concerns, and I -- and I think -- you know, I think going away to college helps both of you to a certain extent because, I mean, it is clear that he was away from home, but I don't think that's the defense argument.

I think the defense argument is there's a world of

53

difference between being away in college, in Ohio, where he is within an hour of world-class care at -- whether it's Ohio State or Mt. Carmel or any of these world-class health care systems, is very different than being in the B.O.P.

If something happens at Gambier, you take an ambulance, and you get to care. And we know at the B.O.P. it's not quite that simple. And so I think the "going away to college" argument also looks at reality, but it's very different.

So I think this is the best approach: I'm going to pause the sentencing. Let's do this research.

Once we get that information, we'll come back, and then I will impose the sentence and talk about the 3553(a) factors and talk about the motion for downward departure at that point, and I'll also reserve ruling on the motion for downward departure.

All right. Do you want to -- do you want to take a minute to talk to your co-counsel and see if there's anything else we should talk about today before we recess on -- in this case?

(Pause in proceedings.)

MR. HUNTER: Thank you, Your Honor.

MS. CZERNIEJEWSKI: I just have two quick things. Your Honor has mentioned about how this has not occurred in a vacuum, and I do want to note too -- I don't think I said this earlier, but I would remiss if I didn't put on the record, to

54

support our argument, and what the -- what Your Honor has mentioned, is that he did admit to having a collection of child pornography that he got from sexting minor children, and that is in the PSR, the statement of facts.

THE COURT: But they got -- did they get that from his admission or was that from his conversations --

MS. CZERNIEJEWSKI: Both.

THE COURT: -- with D.S. Both?

MS. CZERNIEJEWSKI: Both. And then the other thing is does Your Honor want me to reach out to the B.O.P. contact or forward the information to the Court?

THE COURT: Why don't we do it.

MS. CZERNIEJEWSKI: Okay.

THE COURT: Why don't we do it. I think that might get a little better. Maybe.

MS. CZERNIEJEWSKI: Okay. Yeah, you definitely have way more pull than I ever will.

THE COURT: Well, the B.O.P. doesn't seem to be impressed by district court pull.

MR. HUNTER: I've shown you how they respond to me.

THE COURT: Mr. Hunter, do you have anything else that we should talk about today?

MR. HUNTER: No, Your Honor.

THE COURT: Okay. All right. To the Tuccillo family, thank you for coming in. I just -- I think this has been a

good discussion. I know you would feel better knowing what the B.O.P.'s response is. I think -- I think I will speak for all the attorneys: We will all feel better if we have a little more information from the Bureau of Prisons before I do impose the final sentence.

So thank you, Counsel. Thank you, Mr. Tuccillo.

We'll be in recess.

(The proceedings were adjourned at 11:11 a.m. )

- - -

C E R T I F I C A T E

I, Allison A. Kimmel, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable Sarah D. Morrison, Chief Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.

s/Allison A. Kimmel
Allison A. Kimmel, FAPR, RDR, CRR, CRC
Official Federal Court Reporter
October 15, 2025