UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
    PLAINTIFF,                   ) CASE NO. 2:24-cr-190
                                 )
        vs.                      )
                                 )
ANDRES TUCCILLO,                 )
                                 )
    DEFENDANT.                   )
_____  )

        TRANSCRIPT OF PREVIOUSLY CONTINUED SENTENCING PROCEEDINGS
          BEFORE THE HONORABLE SARAH D. MORRISON, CHIEF JUDGE
                TUESDAY, MARCH 3, 2026; 1:40 P.M.
                        COLUMBUS, OHIO

    FOR THE PLAINTIFF:
        Dominick S. Gerace II
        United States Attorney
        By:  Emily Czerniejewski
             Tyler Aagard
        Assistant United States Attorneys
        303 Marconi Boulevard, 2nd Floor
        Columbus, Ohio 43215

    FOR THE DEFENDANT:
        Flannery Georgalis LLC
        By:  Michael Hunter, Esq.
        175 South High Street, Suite 1060
        Columbus, Ohio 43215


                        - - -

    Proceedings recorded by mechanical stenography, transcript
produced by computer.

*Allison A. Kimmel, FAPR, RDR, CRR, CRC*
*Federal Official Court Reporter*
*85 Marconi Boulevard*
*Columbus, Ohio 43215*
*614.719.3225*

2

Tuesday Afternoon Session

March 3, 2026

- - -

(The following proceeding was held in open court.)

- - -

DEPUTY CLERK:  Case number 2:24-cr-190, the United States of America versus Andres Tuccillo.

THE COURT:  Thank you.  If counsel will please enter their appearances, starting with counsel for the government.

MS. CZERNIEJEWSKI:  Good afternoon, Your Honor.

Emily Czerniejewski and Tyler Aagard on behalf of the United States.

THE COURT:  Good afternoon.

MR. HUNTER:  Good afternoon, Your Honor.

Michael Hunter on behalf of Andres Tuccillo, who is to my right.

THE COURT:  Thank you.  Good afternoon, Mr. Tuccillo.

All right.  Well, we were last together on October 14th of last year for Mr. Tuccillo's sentencing.

At that time, I did hear all of the defense arguments in support of their objections and overruled those objections.

I then did adopt the statement of facts and conclusions reached in the Presentence Investigation Report, and we ended up with an Offense Level of 41, with a Criminal History

Category of I.

So the guideline range is the statutory maximum of 240 months.

I did previously hear from Mr. Tuccillo, his mother, and his lawyer, as well as counsel for the government.

Just kind of level setting where we are, I then continued the sentencing hearing so that I could reach out to the Bureau of Prisons to have Defendant evaluated and to make sure that the Bureau of Prisons could handle Mr. Tuccillo's health issues.

So, since that time, since October, I have been in contact with the Bureau of Prisons and did submit a great number of Mr. Tuccillo's medical records to the Bureau of Prisons for review by medical staff.

I did not give them every piece of paper or record submitted by the defense, but I did give them a substantial amount of information, including information regarding the expected future medical treatment needed; part of the defense sentencing memo talking about the health issues; materials from Mr. Tuccillo's cardiologist; the psych exam report submitted by the defense; and then the records from Mr. Tuccillo's doctors' appointments in 2025.

I also told the Bureau of Prisons if they had more information or questions, based on what I had submitted, I could give -- get them more documents either from what

4

I had in my possession or could ask Mr. Hunter for more documents.

It did take some time to get a response from the Bureau of Prisons, but I did receive a response from the Office of Medical Designations and Transportation, who consulted with the regional medical director for the northeast region on Mr. Tuccillo's case.

They have determined that Mr. Tuccillo would be classified as a Care Level 4, and his medical care would be coordinated with a cardiac chronic care clinic at one of the Bureau of Prisons' institutions.

Mr. Tuccillo would then be seen on a periodic follow-up basis with the clinic.

But the bottom line is that the Bureau of Prisons would be able to handle and manage Mr. Tuccillo's medical needs.

I will say, from another case I just recently presided over, they also -- the Bureau of Prisons can do medical furloughs if there is something that needs to be done at a specialized institution, and so there is medical furloughs from being in the custody of the Bureau of Prisons.

I also did ask my contact whether there is anything that I would need to do after sentencing to make sure that Mr. Tuccillo would get to the right place, and I was told that Mr. Tuccillo has now -- as a result of my inquiries --

been flagged as a Care Level 4 inmate, so the Office of Medical Designations and Transportation will be ready for him.

They did suggest that I include in the judgment the recommendation to the Bureau of Prisons that Mr. Tuccillo be designated to a facility that can properly assess his medical needs which, obviously, I will be doing.

This makes -- this will just make the B.O.P.'s classification and designation staff aware and to immediately recognize that the medical people have already reviewed Mr. Tuccillo's medical information.

So, with that, my intent on continuing the sentencing hearing was to get this information from the Bureau of Prisons.

I did not intend to open up additional arguments from the parties as to the appropriate sentence.  Both sides have already submitted sentencing memos.

I have given both sides every opportunity to make arguments and to set forth their positions at the October hearing.

Nevertheless, Mr. Hunter did file a reply memo on sentencing, and I did read the memo, and I instructed the government not to respond to that memo because I, frankly, just thought about -- I didn't want to get into a paper war, a back-and-forth, and I knew we would have an opportunity today.

And then, I know, more recently, Mr. Hunter did file

a motion seeking to provide additional materials related to Mr. Tuccillo's medical treatment since October.

So, Mr. Hunter, I told you I wouldn't let you file it, so why don't you tell me now.  What's happened since October?

MR. HUNTER:  Thank you, Your Honor.

Two things that I wanted to bring to the Court's attention in the addendum that I filed, and that is that Mr. Tuccillo was diagnosed with a staph infection in November.

He has had treatment since that time.  He's on antibiotics.  He's now on a second round of antibiotics, and he has his next appointment with a specialist on March 11th.

Additionally, during that same approximate timeframe, during the checkup, he was diagnosed with an enlarged spleen, and so that is -- those are two medical developments that had happened since the sentencing that I wanted to bring to the Court's consideration.

THE COURT: Okay.  All right.  Thank you, Mr. Hunter.

All right.  Ms. Czerniejewski, do you want to respond to anything raised by Mr. Hunter in his reply memorandum or anything -- I mean, this is a short update -- about any medical treatment since October?

MS. CZERNIEJEWSKI:  Your Honor, I expressed the sentiment with Mr. Hunter already, but I do want to note

that obviously I was taken aback by the kind of like "Monday morning quarterback" attack on the arguments made at the sentencing hearing, and I am not going to respond to them because most of my arguments have already been documented with the Court, but the only thing I want to note about this addendum is that it again focuses on a one-week period in November of 2021.

If you look at all the various subsections related to the requests to -- I don't know -- to reopen proofs or reargue certain facts of the case, they continuously have experts in the form of Dr. Zachariah and Dr. Preen opine about this lapse medically and cognitively leading up to the exploitation as charged in this case -- which was a one-week timeframe in November.

What I let Mr. Hunter know, when he filed this, is that I did intend to bring up a report that I received from Mr. Brian Joslyn at the time the plea negotiations were going on, and I don't think it has been a report that has been provided to the Court, but it kind of contradicts these additional arguments that have been made by statements that Mr. Tuccillo made to someone evaluating him.

So, for context, the search warrant in this case was executed --

THE COURT: I am going to interrupt you. Just so you know, I have not seen this report you reference.

8

MS. CZERNIEJEWSKI: Okay. Your Honor, I would then ask to enter or to provide to you -- I'll call it Government's Exhibit number -- I think -- let me see where I left off.

Actually, I don't think we had attached any exhibits, so I'll just call it Exhibit 1.

And if I may approach.

THE COURT: You may.

MS. CZERNIEJEWSKI: So, just for context as it relates to this specific report, a search warrant was executed at Kenyon College, and within 48 hours, Mr. Brian Joslyn had been retained in this case and had sent Mr. Tuccillo for an evaluation with Dr. David Tennenbaum, and that report was provided to me almost immediately in consultation with my assessment of this case.

But one of the things that Mr. Tuccillo self-reported was that during COVID -- which occurred in March of 2020 -- he began to look at child pornography and that his addiction to child pornography had been accumulating.

And so, during COVID isolation, he states, "Porn was satisfying to me sexually. I started going to forums, chatrooms. And once you go down the rabbit hole, you see 15-year-olds."

And initially he started gravitating toward these thoughts, and then he downloaded Kik, which was the platform that was used to communicate to D.S. in this case

as it relates to the sexual abuse of the nine-year-old.

So, by Mr. Tuccillo's own admissions, this was not a one-week time period.

So if we are -- the only thing I take issue with the supplemental report is that, again, we are saying that the surgery he had in February of 2021 -- so almost a year after COVID began -- is the reason for a downfall related to this one-week lapse of judgment, and I would just note that the statements of the defendant related to his addiction to child pornography contradict that themselves.

So, the lack of insight from the medical professionals and from the arguments lodged by the defense is at issue with the facts in this case, and it's the same argument we made at the first sentencing hearing in October -- that this wasn't an isolated event.

One of the first messages he sent to D.S. was:  If you sexually assault this nine-year-old, I will send you videos -- indicating he probably had videos to send.

So, again, when Your Honor considers sentencing and a sentence in this case -- and, again, we stand by the recommendation of 240 months, which is a ten-year sentence -- that is well below the guidelines and doesn't even reach the mandatory minimum of what he could have been facing had he been charged with sexual exploitation of a minor.

I would just ask Your Honor to consider the fact that

this was not, despite the numerous opinions issued, for years in this case, a one-week isolated event.

THE COURT:  Your recommendation is 120 months -- right? -- ten years?

MS. CZERNIEJEWSKI:  I'm sorry, yes.

THE COURT:  You said 240 months.  I wanted to make sure I --

MS. CZERNIEJEWSKI:  120 months.  Thank you, Your Honor.

THE COURT:  Yeah.  Thank you.  Just sit down.  I want to read the --

(Pause in proceedings.)

MS. CZERNIEJEWSKI:  I don't want to interrupt your reading, but a lot of what I reference is at the bottom of page 4.

There is a paragraph about the history and details of the case when he makes admissions about doing this for months.

THE COURT:  Okay.  Thank you.

(Pause in proceedings.)

THE COURT:  I will say I can -- I will make this part of the record.  It only goes through page 7.  I don't know if there's additional pages, but there's like --

MS. CZERNIEJEWSKI:  Oh, I have the last page.  I apologize.  That was a staple issue.

11

THE COURT:  That's all right.

MS. CZERNIEJEWSKI:  If I may approach.

THE COURT:  You may.

(Pause in proceedings.)

THE COURT:  I obviously didn't sit here and read an 8-page letter, but I read the part where he was discussing the history of him looking at pornography, at the bottom of page 4 and the top of page 5.

Mr. Hunter, you jumped up that you wanted to add something.

MR. HUNTER:  I'm not the first lawyer, I suspect I won't be the last lawyer, to say that it is not fair to have a charging document that charges a period of time, to have an agreed Statement of Facts to a plea agreement, that lists facts that somebody is agreeing to, and then to get a PSR and the government later expanding, though, that --

THE COURT:  Oh, Mr. Hunter, let me be clear:  I mean, as you know, I am all about fairness, and I bend over backwards to be fair to a defendant, but to the extent that we are -- what he pled guilty to was the one-week.  Absolutely.  That's the charge.  That's the offense.

But as a sentencing court, I have to consider more than that week.  We look at the background.  I mean -- I mean, we've gone back to his medical records and his personal history back to childhood, and so this is absolutely fair game

12

as part of the overall what is -- what's going on here, and I think it's very fair to say, no, this isn't a -- what he's pled guilty to is one week, but when you as a court are considering the 3553(a) factors, as we look at what is the fair sentence, I have to look at the entire picture.

And knowing what he's saying about his own conduct is fair. He's not being charged for looking at child pornography in 2020 or earlier in 2021. He's charged for this one week, but I do think Ms. Czerniejewski has a point to her -- what I will call it -- objection, I don't know if that's the right term -- of what is I think an attempt by the defense to kind of say: Well, Your Honor, this is one week. He had a psychological break. He had a lapse. He had, you know, a mental health issue, that that week was a lapse, and so he should only be judged for that week.

And that's not fair. That's not fair to the facts, and, frankly, it's not fair to Mr. Tuccillo because this clearly -- and that's what I said at the last hearing, that you objected to, is, well, it's not the fair to him to infer that he got those images at some point before that week.

Well, it's clear that, particularly after this, he didn't necessarily get it that week. He was getting images. He was trading earlier.

It's not part of the charge. I am not going to necessarily do an upward departure because of it, but it

is certainly a factor that is fair for me to consider.

MR. HUNTER:  Your Honor, I would say that the -- I don't disagree with anything that the Court said.

Obviously, there is no limitation on what the Court can consider in imposing a fair sentence in this case.

I don't think that it -- even if it is a more pronounced period of time, I don't think that that cuts against the medical information that we have, that you still have a series of traumatic events, and all of those things, the kind of unrebutted testimony of the doctors who have examined him, that there was a -- there were mental health issues, including dissociative state during that approximate timeframe.

THE COURT:  Okay.  But let me -- so I'm clear:  This dissociative state, psychological break -- I mean, it kind of -- because it looks to me like the doctors used those two terms not quite interchangeably, and they are as I understand it different concepts in mental health, but there is not a suggestion, though, that the break, dissociative state, lasted a year and a half, is there?

MR. HUNTER:  No, Your Honor.

THE COURT:  Okay.  And there is not even the suggestion that it lasted six months.

MR. HUNTER:  No, Your Honor.  I don't think that anybody put a timeframe on it.  I think that's fair, Your Honor.

14

THE COURT:  Okay.

MR. HUNTER:  It is rather --

THE COURT:  But -- but -- but, then you can say, but I want to understand, but at least the mental health providers that you have provided me the information on, they tie this particular dissociative state to the February -- January-February 2021 surgery where he did have a near-death experience, that that's kind of -- was somewhat -- in conjunction with all of the health issues he's had, but that that was somewhat the trigger that may have led to the dissociative state, correct?

MR. HUNTER:  Correct, Your Honor.

THE COURT:  Okay.

MR. HUNTER:  Yeah.  And all of that is simply the mental health issues that the defendant was dealing with during that time, not as a defense, not to relieve criminal culpability, but only as a mitigative factor in this case.

THE COURT:  Okay.  Sure.  I understand.

I don't think I need to hear anything else from you, Ms. Czerniejewski, after that.  Thank you.

Anything additional from Probation?  I don't think I have anybody -- do I have anybody here from Probation?  No, apparently not.

Okay.  Well, Mr. Tuccillo, if you would please stand.

MR. HUNTER:  Your Honor --

15

THE COURT: Yes.

MR. HUNTER: -- I thought that the other last place that we left off at the sentencing was the Court had not yet ruled on the government -- on the defense motions for downward departure and variance.

THE COURT: You are right. I have not.

MR. HUNTER: Okay. I just wanted to make sure we weren't jumping ahead, Your Honor.

THE COURT: All right. So Mr. Tuccillo is before me for sentencing after pleading guilty -- Mr. Hunter, you can stand too -- after pleading guilty to possession of child pornography.

After the Supreme Court decision in *United States v. Booker,* I have to do a three-part analysis before I impose the final sentence.

The first task it to compute the sentencing guidelines, and that has been done.

I next consider the guidelines themselves to see if there are any appropriate departure bases either up or down.

And on this point, as Mr. Hunter mentioned, defense counsel has moved for a downward departure on four different grounds -- five different grounds.

The first is under Section 5H1.1 with regard to the age of the defendant, and that is denied.

The second is under 5H1.4, and that is for seriously

16

infirm defendant, and that is granted.

I will apply a 14-level reduction, and that does take it down to a 27 Offense Level with a guideline range of 70 to 87 months.

Under section -- the next basis that Mr. Hunter has moved to depart is Section 5H1.3, the mental and emotional health conditions, and that is denied, and the reason for that is I think I gave a substantial downward departure under the 5H1.4, and my intention in doing that was to address both the heart issues and the mental and emotional health issues, so I am not going to -- I think it would be duplicating to give another departure under 5H1.3.

And then finally 5K2.13 as a grounds for departure, which again has to do with mental health condition and treatment, as I read the sentencing guidelines, I think that provision was deleted from the sentencing guidelines in December -- excuse me -- in the November guideline updates. But even if they were still in place, I think the previous provision for the sentencing guidelines requires that the reduced mental capacity have contributed substantially to the commission of the offense, and I just don't think that has been proven here.

Then as part of sentencing, the last step requires me to look at a series of factors contained in federal law to make sure that any sentence imposed is sufficiently severe

17

to accomplish all of the goals of sentencing, but no more severe than necessary to accomplish those goals.

When I look at those factors, I start with the nature and circumstances of the offense, together with the criminal history and the personal history and characteristics of the defendant.

Here, Mr. Tuccillo was trading sexually explicit images online with D.S. of D.S.'s sister and other minors. In some of the communications between them, Mr. Tuccillo suggested things that D.S. should do to his sister and requested that D.S. film those activities and send them to Mr. Tuccillo.

Mr. Tuccillo had multiple images that he sent to D.S., and there is no evidence of where or when he procured those images. But, again, the only inference that I think is a reasonable inference is that he got them before he engaged from D.S.

Even accepting the defense argument in the reply memo that Mr. Tuccillo could have pulled those images from the internet the same day that he talked to D.S., his language and his discussion with D.S. undercuts in my mind any argument that this was a temporary four-day lapse in judgment.

Mr. Tuccillo has accepted responsibility for this offense.

Mr. Tuccillo and his three siblings were raised in Connecticut. His father worked, and his mother was a

18

homemaker.

Mr. Tuccillo has congenital heart disease, causing him to have had 12 major surgeries -- his most recent surgery was in 2023 -- and preventing him from engaging in sports or from truly engaging with his peers in some instances.

He was bullied because of his small stature. He has scars on his chest and the malformation of his hands.

At the time of his offense in this case, Mr. Tuccillo was attending Kenyon College. He almost died after a heart surgery in 2021.

In addition to his heart issues, he has been diagnosed with osteoarthritis in his hands in 2020 and with severe obstructive sleep apnea syndrome in 2023.

He does now have PTSD after his 2021 near-death experience. He was medically paralyzed but awake and could hear everything going on around him.

His doctors believe that Mr. Tuccillo was in a dissociative state and had a psychotic break at the time of the offense.

Mr. Tuccillo's doctor says that he does need additional open heart surgeries and complex monitoring to avoid heart failure.

Dr. Leopold says that Mr. Tuccillo's heart disease care is extremely specialized and necessitates at least yearly outpatient follow-up at one of the few accredited

comprehensive care centers in the United States.

His sleep apnea also presents special problems in conjunction with his heart issues, and his skeletal defects may also require additional surgeries.

As part of his mental and emotional health issues, Mr. Tuccillo found it emotionally challenging to have roommates while he was in college. He suffers from depression and anxiety. He also has developmental disabilities that limit his interpersonal skills and make relating to others challenging. He has been actively engaged in counseling.

Nevertheless, Mr. Tuccillo did graduate from Kenyon College and then enrolled in a graduate studies program at Mississippi State University, and he was studying anthropology and indigenous North American anthropology.

He has continued -- I hear a phone.

(Pause in proceedings.)

THE COURT: Mr. Tuccillo has continued to work on his degree online while on pretrial release.

As part of sentencing, I must also look for a sentence that promotes deterrence to people who might be inclined to commit this kind of offense, look to the seriousness of the crime involved, protect the public, and also promote respect for the law.

And, finally, I must avoid unwarranted sentencing disparities among defendants with similar records and guilty

20

of similar conduct.

So when I take all of this into consideration, I do believe a variance is appropriate.

His age at the time his offense, his severe medical and health issues and mental health issues, his developmental disabilities, all necessitate a variance.

So pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. Section 3553(a), it is the judgment of the Court that the defendant, Andres Tuccillo, is hereby sentenced to a term of 36 months of incarceration -- so that is three years -- to be followed by a 20-year term of supervised release.

Within 72 hours of release from imprisonment, he will have to report to the probation office in the district to which he is released.

While on supervision, you cannot commit another federal, state, or local crime.

Mr. Tuccillo, you will be prohibited from possessing a firearm, ammunition, destructive device, or dangerous weapon.

You cannot unlawfully possess a controlled substance and must refrain from any unlawful use of a controlled substance.

You will have to submit to one drug test within 15 days of release from imprisonment and at least two periodic tests thereafter as determined by the Court. I do -- oh, no.

I take that back, because I do find there's a low risk of future substance abuse on the part of the defendant, so I do waive the requirement of mandatory drug testing. So I apologize for that.

You will have to cooperate in the collection of your DNA as directed by the probation officer and comply with the standard conditions of supervision adopted by this Court, as well as the following special conditions:

First, Mr. Tuccillo shall participate in a sexual offender treatment program, to include a sex offender risk assessment, psychosexual evaluation, and/or other evaluations as needed.

Mr. Tuccillo shall follow the rules and regulations of the sex offender treatment program as approved by the probation office.

He shall sign all necessary authorization forms to release confidential information so that treatment providers, the probation officer, polygraph examiner, and others as necessary, are allowed to communicate openly about the defendant's course of treatment and the progress of treatment.

Mr. Tuccillo shall make a copayment for sex offender treatment services not to exceed $25 per month, with the exact amount determined by his ability to pay.

Number two, Mr. Tuccillo shall be subject to periodic polygraph examinations at the discretion and direction of the

22

probation officer as a means to ensure that he is in compliance with the requirements of his supervision or treatment. The polygraph testing will be at his own expense, based on the probation officer's assessment of his ability to pay.

Number three, Mr. Tuccillo's residence and employment shall be preapproved by the probation officer and must be in compliance with state and local law.

Number four, he shall not view or possess material, images, videos, or computer files containing sexually explicit conduct as defined by 18 U.S.C. Section 2256(2)(A) and (B).

Number five, Mr. Tuccillo shall have no contact with any minors, with the exception of his own children. The term "contact" extends to all forms of communication, such as email, telephone, text, letter, and any other form of electronic communication.

This provision does not encompass persons under the age of 18 such as ticket vendors, cashiers, or waiters with whom he must deal in order to obtain normal commercial services.

He shall be prohibited from loitering where minors congregate such as but not limited to playgrounds, arcades, amusement parks, recreation parks, sporting events involving minors, shopping malls, and public swimming pools.

Number six, Mr. Tuccillo shall submit to the

23

installation of software meant to monitor computer activities on any computer that he is authorized to use at his own expense. The software will record any and all activities on his computer. The software will be checked on a periodic basis.

Mr. Tuccillo has no expectations of privacy regarding computer use or information stored on the computer, and he shall make all other users of said computer aware of the monitoring software.

Mr. Tuccillo understands that any information gathered by said software may be used against him in subsequent court actions regarding the defendant's computer use and his conditions of supervision.

Furthermore, Mr. Tuccillo shall comply with the rules set forth in the Computer and Internet Monitoring Agreement and the Computer and Internet Acceptable Use Agreement adopted by the Southern District of Ohio.

Number seven, in consideration of 18 U.S.C. Section 3583(d)(3), Mr. Tuccillo shall submit and/or surrender any media device to which he has access and/or control to a search based on reasonable suspicion of contraband or evidence of a violation of a condition of supervision.

A media device is defined as, but is not limited to, any devices capable of accessing the internet, storing images, text, or other forms of electronic communication.

24

Number eight, Mr. Tuccillo shall have no contact either telephonically, visually, verbally, or through written material or through any third party with the minor victim or any of his immediate family members.  And that's D.S.

Number nine, Mr. Tuccillo shall participate in a program of mental health assessment and/or counseling as directed by the probation office until he is released from that program.  There will be a copayment of no more than $25 per month for those services, and the exact amount is determined by your ability to pay.

Number ten, Mr. Tuccillo shall not consume alcoholic beverages.

Number eleven, Mr. Tuccillo shall participate in a program of testing and treatment -- no.  I'm sorry.  I'm not doing that number eleven.

Number eleven will be that you shall not -- that you shall provide all financial information requested by the probation officer.

I do find that Mr. Tuccillo does not have the ability to pay a fine.  Is there a restitution order?

MS. CZERNIEJEWSKI:  I saw the PSR, and it notes that he doesn't have the ability to pay.

The government is not asking for the assessment pursuant to 18 U.S.C. 3014 but pursuant to the plea agreement and per statute 18 U.S.C. 2259(A), which is the AVAA assessment, is

mandatory, and because the victim is not seeking restitution in this case, we are asking for that $17,000 pursuant to 2259(A).

THE COURT: Okay. And it's $17,000?

MS. CZERNIEJEWSKI: That's correct.

THE COURT: Okay. Mr. Hunter, any objection to the $17,000 AVAA?

MR. HUNTER: I believe it's statutorily required, Your Honor.

THE COURT: Okay. Then I do find the ability -- that he does not have the ability to pay just the standard fine or the JVTA fine, but I do order him to pay $17,000 in AVAA assessments, and it sounds like there's -- so there's no restitution order for D.S.

While incarcerated, if Mr. Tuccillo is working on a non-UNICOR or Grade 5 UNICOR job, he shall pay $25 per quarter towards his assessment, the AVAA assessment.

If he works a Grade 1 through 4 UNICOR job, he shall pay 50 percent of his monthly pay towards that assessment, and any change in the schedule shall be made only by order of the Court.

I do waive the requirement of interest on any balance on the assessment if it's not paid within 15 days from the entry of judgment.

With that, are there any legal impediments or

26

objections to the sentence, Mr. Hunter?

MR. HUNTER:  Your Honor, I have to raise the objection of the receipt of information from the Bureau of Prisons that the Court received without that information being shared with the parties so that I might have had an opportunity to rebut it or to retain our own defense expert.

We continue to believe that the Bureau of Prisons does not have the capability to do the kind of monitoring or care to keep Mr. Tuccillo alive, and so we would raise that objection.

THE COURT:  Okay.  Anything other than that objection?

MR. HUNTER:  Your Honor, we would ask that as part of the sentence that the Court recommend that -- placement of the last portion of that sentence to a halfway house to allow Mr. Tuccillo to transition back into the community.

THE COURT:  Okay.

MR. HUNTER:  We would also ask for a voluntary surrender in this case and join the Pretrial Services officer in the recommendation made to the Court that Mr. Tuccillo be allowed to voluntarily surrender in this case.

THE COURT:  All right.  Hold on just one moment.

MR. HUNTER:  And on the halfway house issue, Your Honor, I would be happy to provide typical language that we'd ask to be in J&Cs for the Bureau of Prisons on the halfway house, if I could provide that after this hearing.

THE COURT:  Okay.  All right.  Thank you.

Ms. Czerniejewski, any objections, legal impediments, or response to either the objections or requests from the defense?

MS. CZERNIEJEWSKI:  No objections by the government as to the sentence Your Honor imposed.

We would object to the placement of the defendant in a halfway house.  He has support and resources which has been litigated ad nauseam for his adjustment period back into the community.

That's a facility reserved for individuals who are stepping down, who do not have that type of support, and I think that would be an ill use of the Court's resources considering what the defendant has in place at this time.

I also think that -- I don't know that he would even be accepted there given his medical concerns -- certainties.

If the defense is that the B.O.P. can't handle, how can the halfway house?

So I think that's counterintuitive to the arguments counsel is trying to lodge regarding the placement of the defendant at the B.O.P.

We are asking for the defendant to be taken into custody today.  He has been sentenced to a term of imprisonment for three years, and he has delayed this, and he has been -- I shouldn't say he has delayed.  He has had time to prepare

for this day since 2021, when this case became overt.

Also, pursuant to statute, specifically 18 U.S.C. 3143, the defendant shall be taken into custody at this time.

There is no substantial likelihood that a motion for acquittal or new trial would be granted because this is a plea agreement in which the defendant has admitted his guilt, and this is not a case where there is no sentence of imprisonment. In fact, one was just imposed.

So, when neither of those options or statutory provisions exist, the Court shall take the defendant into custody at this moment, and so we are asking that that mandatory statute be imposed at this time.

Again, given the amount of time he has had to prepare for this moment, I think it's completely reasonable that he be taken into custody.

THE COURT: Okay. All right. I am going to allow Mr. Tuccillo to voluntarily surrender.

I do -- I am a little concerned about the staph infection, and he does have an appointment on March 11th, and I think to ensure that the medical transition does go smoothly, I want to make sure we get that infection taken care of and get that addressed.

I do deny the request for recommending a halfway house, but I will allow him to voluntarily surrender.

Mr. Hunter, anything else?

And your objection is noted for the record, and to the extent that I rule on your objection, it's overruled.

MR. HUNTER: Thank you, Your Honor.

Normally, we would make a recommendation for a particular facility. I don't know that that -- to the extent that is going to be considered by the B.O.P., I think they are going to make a determination based on medical availability.

We would ask that it be as close as possible to Connecticut.

THE COURT: Okay. I will make that request, but -- yeah, but I think the bigger priority is that he is at the right medical facility so --

MR. HUNTER: Yes, Your Honor.

THE COURT: All right.

Well, I do need to, Mr. Tuccillo, advise you of your right to appeal the sentence that I just gave you.

Under some circumstances, a defendant has the right to appeal his sentence. However, he may waive that right as part of a plea agreement, and in this case you did enter into a plea agreement in which you waived some or all of your rights to appeal the sentence itself.

Those waivers are generally enforceable, but if you believe the waiver itself is not valid, you can present that theory to the appellate court.

If you do want to appeal, you must file a written

Notice of Appeal within 14 days from the entry of judgment.

The judgment will probably go on tomorrow. It probably won't get on today, but I would count on it being tomorrow, and so that 14 days would start running from tomorrow.

If you cannot afford the filing fee or a lawyer to represent you, you can apply to this Court and the filing fee may be waived and a lawyer may be appointed to represent you.

Sir, do you understand your right to appeal?

THE DEFENDANT: Yes.

THE COURT: All right. Do you want to talk with Mr. Hunter and let me know if you want to appeal the sentence that I've just given you?

(Pause in proceedings.)

THE DEFENDANT: I'm going to confer with my counsel before I make any decision, Your Honor.

THE COURT: That's good. You will have time to do that after we are done here, so that is fine.

You just got that -- that fourteen days is hard and fast, so I just don't want you to miss that date, if you do decide after talking with your counsel that you want to appeal.

Does the government want to lodge any kind of appeal or objection to me allowing him to voluntarily surrender?

MS. CZERNIEJEWSKI: If I could just understand

the timeframe he has to self-report.  I know that he has an appointment next week, but I would ask 14 days to self-surrender.

THE COURT:  I will say the B.O.P. usually gives them about 30 days, and so I will allow that to happen.

MS. CZERNIEJEWSKI:  Out of principle, just for my arguments made before you in the future, I would obviously object to it based on the statute, but I understand.

THE COURT:  Yeah.  I fully understand, and that's why I want to allow you to make your record.

MS. CZERNIEJEWSKI:  Thank you, Your Honor.

THE COURT:  All right.  Anything further then for the defense, Mr. Hunter?

MR. HUNTER:  No, Your Honor.

THE COURT:  How about for the government?

MS. CZERNIEJEWSKI:  Nothing further, Your Honor.

THE COURT:  All right.  Thank you, Counsel.

Good luck to you, sir.  Good luck to you, sir, and to your family, Mr. Tuccillo.  Court will be in recess.

(The proceedings were adjourned at 2:19 p.m.)

32

- - -

C E R T I F I C A T E


        I, Allison A. Kimmel, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable Sarah D. Morrison, Chief Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


                        s/Allison A. Kimmel
                        Allison A. Kimmel, FAPR, RDR, CRR, CRC
                        Official Federal Court Reporter
                        April 1, 2026